1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WASHINGTON MUTUAL, INC. AS THE SUCCESSOR IN INTEREST TO H.F. AHMANSON & CO. AND SUBSIDIARIES,

        *Plaintiff*,

        v.

UNITED STATES OF AMERICA,

        *Defendant*.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.     CV06-1550 BJR

MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

Plaintiff Washington Mutual, Inc. ("Plaintiff"), as successor in interest to Home Savings of America, FSB ("Home"), brought this tax refund suit to recover taxes assessed by the Internal Revenue Service ("IRS") with respect to the 1990, 1992, and 1993 tax years. This case represents a chapter in a continuing saga that has its genesis in the savings and loan crisis of the late 1970's and early 1980's. Since that time, numerous lawsuits involving Home and other similarly situated litigants have wound their way through multiple courts, including the United States Supreme Court, the Federal Circuit, and the Ninth Circuit.

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

In the case before this Court, Plaintiff claims that it is entitled to refunds due to tax deductions and losses for certain intangible assets referred to by the parties as the "Branching Right" and the "RAP Right."[1] Plaintiff filed amended tax returns seeking the refunds on behalf of Home, and after the IRS denied the refund claims, Plaintiff filed suit against Defendant, the United States of America, on behalf of Home in the district court for the Western District of Washington. This case was originally assigned to the Honorable John C. Coughenour. Shortly thereafter, both parties moved for partial summary judgment on the issue of whether Home could establish a cost basis for the Branching and RAP Rights (a taxpayer must be able to establish a cost basis in an asset before the taxpayer is entitled to a tax refund). Judge Coughenour granted Defendant's motion for partial summary judgment, ruling that Home did not have a cost basis in the Rights, and therefore, was not entitled to a tax refund. Plaintiff appealed and the Ninth Circuit reversed. The Ninth Circuit determined that Home has a cost basis in the Branching and RAP Rights based on what it cost Home to acquire the Rights, and remanded the matter with instructions to the court to proceed with determining the cost basis.

Thereafter, the case was reassigned to this District Court Judge and a bench trial was held on December 12 through December 19, 2012. Having heard the testimony of the witnesses, reviewed the evidence in the record together with the briefs filed by the parties, this Court finds that Plaintiff has not proved, to a reasonable degree of certainty, Home's cost basis in the Branching and RAP Rights. Accordingly, the Court will GRANT judgment in favor of Defendant. The reasoning for this Court's determination follows.

---

[1] Exactly what the Branching and RAP Rights are will be discussed in detail later in this Order.

## II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    The Savings and Loan Crisis

As stated previously, this case arises out of the savings and loan crisis of the late 1970's and the early 1980's. *Wash. Mut., Inc. v. United States*, 2008 WL 8422136, at *1 (W.D. Wash. Aug. 12, 2008) (hereinafter referred to as "*Washington Mut. I*"). By way of background, in the late 1970's and early 1980's, out of concern for rising inflation rates, the Federal Reserve saw fit to allow interest rates to rise to unprecedented levels. The effect of this phenomenon on savings and loan associations (also known as "thrifts") was disastrous. This is because thrifts derived their profitability from a spread between the interest they paid to depositors and the interest they charged on loans (which were almost exclusively long-term, fixed-rate mortgages). *Id.*; s*ee also United States v. Winstar Corp*., 518 U.S. 839, 845 (1996). In normal times, the spread was positive for the thrifts, that is, a thrift could pay a lower interest rate to its depositors, while the interest rate it charged borrowers was sufficiently higher to ensure profitability. *Wash. Mut., Inc. v. United States*, 636 F.3d 1207, 1210 (9th Cir. 2011) (hereinafter referred to as "*Washington Mut. II"*). When interest rates soared in the late 1970's and early 1980's, the world turned upside down for thrifts. *Id*. Given the higher interest rates that were available in the market, in order to attract more depositors, thrifts had to pay higher interest rates on their deposits. *Id*. Meanwhile, the thrifts' outstanding mortgage loans were locked in at long-term, fixed-rates that were significantly lower than the prevailing rates. *Id*. To make matters worse, given the high interest rates being charged for mortgage loans, housing purchases came to a near standstill, so there was little or no opportunity to lend out new mortgage money. *Id*. The entire thrift industry was insolvent to the tune of billions of dollars. This situation is commonly described as the savings and loan crisis. *Winstar,* 518 U.S. at 845.

3

The Federal Savings and Loan Insurance Corporation (hereinafter "FSLIC"), in its capacity as thrift regulator and insurer of thrift deposits, was obligated to take over and liquidate any thrift that had liabilities that exceeded its assets. Dkt. No. 154 at p. 6 (Admitted Fact 5). "Realizing that FSLIC lacked the funds to liquidate all of the failing thrifts, the [Federal Home Loan Bank Board (hereinafter "Bank Board")][2] chose to avoid the insurance liability by encouraging healthy thrifts … to take over ailing [thrifts]" in transactions known as "supervisory mergers." *Winstar*, 518 U.S. at 847. Supervisory mergers—in which healthy thrifts assumed all of the obligations of failing thrifts—were not intrinsically attractive to healthy thrifts; nor did FSLIC have sufficient cash to promote the supervisory mergers through direct subsidies alone. *Id*. at 848. Instead, FSLIC had to devise other non-cash incentives to attract healthy thrifts to these transactions. *Id*. Two such incentives are central to this dispute.

Before the savings and loan crisis, regulations prohibited thrifts from opening branch offices outside states in which their home offices were located. *Washington Mut. II*, 636 F.3d at 1231. Healthy thrifts wanted to expand nationally into growing markets. FSLIC recognized this and issued regulations in September 1981 that allowed a thrift to operate branches in a state other than its home state, but only if the first branch in the non-home state was acquired in a supervisory merger. The parties refer to this as the "Branching Right."

In addition, thrifts were subject to regulations that required them to maintain a certain amount of capital, known as the "minimum regulatory capital requirement." *See Home Sav. of Am. v. United States*, 57 Fed. Cl. 694, 697 (Fed. Cl. 2003). During the height of the savings and loan crisis, a thrift was required to maintain minimum regulatory capital that equaled at least three percent of the thrift's liabilities. 47 Fed. Reg. 3543 (Jan. 14, 1982). FSLIC recognized that

---

[2]      Congress vested the Bank Board with the authority to charter and regulate federal thrifts. *Wash. Mut*., 636 F.3d at 1210.

4

this requirement would be an impediment to supervisory mergers given that a healthy thrift would have to acquire the liabilities of a failing thrift, liabilities that exceeded the failing thrift's assets. Therefore, regulators allowed health thrifts to apply the "purchase method" of accounting to supervisory mergers. *Washington Mut. II*, 636 F.3d at 1210.

The purchase method of accounting permitted the acquiring thrift to designate the excess of the acquired thrift's liabilities over the acquired thrift's assets as an intangible asset known as "supervisory goodwill." *Id*. The supervisory goodwill could then be counted towards the acquiring thrift's minimum regulatory capital requirement. *Id.* (citing *Winstar*, 518 U.S. at 850–51). Regulators also permitted the acquiring thrift to amortize the supervisory goodwill over a significant period of time, up to forty years in accordance with regulatory accounting principles. *Id.* The right to designate the excess liabilities of an acquired thrift as supervisory goodwill and to amortize the supervisory goodwill over a 40-year period became known as the "RAP Right."[3] *Id*.

**B.    Home Acquires Three Failing Thrifts through a Supervisory Merger**

In 1981, Home was considered a "healthy" thrift, and in November of that same year, it agreed to a supervisory merger with three failing thrifts: Security Federal Savings and Loan Association ("Security") and Hamiltonian Federal Savings and Loan Association ("Hamiltonian"), both thrifts located in Missouri, and Southern Federal Savings and Loan Association ("Southern"), a thrift located in Florida (hereinafter the "Missouri-Florida Transaction). *Washington Mutual I*, 2008 WL 8422136 at *2. Under the terms of the Missouri-Florida Transaction, Home assumed all of the liabilities of the three failing thrifts in return for a "generous incentive package" from the government. *Washington Mut. II*, 636 F.3d at 1219. As

---

[3]    RAP is an acronym for Regulatory Accounting Principles.

5

part of this incentive package, Home received FSLIC assistance in the form of cash contributions (to the extent the book value of the failing thrifts' liabilities exceeded the book value of their respective assets), indemnities related to covered assets, and "other payments and/or credits to be accounted for through use of a 'special reserve account.'" *Washington Mut. I*, 2008 WL 8422136 at *2. Home also received Branching Rights in Missouri and Florida, which meant that California-based Home would be permitted to open branches in Missouri and Florida. *Id*. In addition, Home was given the RAP Right (*i.e.*, Home was permitted to count the excess of the failing thrifts' liabilities over their assets as "supervisory goodwill" and apply it to Home's minimum regulatory capital requirement). *Id*. Finally, Home was able to structure the transaction as a tax free "G" reorganization, which allowed Home to "carry over" the tax basis associated with the acquired assets and thereby realize substantial built-in losses by selling the loans of the acquired thrifts. *Id*.

### C.   *Winstar* and Related Litigation

In 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183. *Washington Mut. II*, 636 F.3d at 1211. Among other changes, FIRREA no longer allowed thrifts to count supervisory goodwill toward their minimum regulatory capital requirement. *Winstar*, 518 U.S. at 857. This change had a significant impact on thrifts that had acquired failing thrifts through supervisory mergers, as the acquiring thrifts had relied on the supervisory goodwill granted to them at acquisition. *Id.* Three thrifts sued the United States for damages on both contractual and constitutional theories, arguing that the government had promised the thrifts that the supervisory goodwill could be counted toward their regulatory capital requirements and FIRREA was a breach of the government's promise. *Id*. at 858. The Supreme Court agreed, holding that the government

6

breached its contracts when, pursuant to the new regulatory capital requirements imposed by FIRREA, the federal regulatory agencies limited the use of supervisory goodwill and capital credits as acceptable regulatory capital. *Id*. at 870.

### D.    Current Litigation

In 1992 and 1993, Home sold its Missouri branch offices and in 1998 Plaintiff acquired Home. *Id*. at 1214. In 2005, Plaintiff filed amended income tax returns on behalf of Home, claiming refunds for tax years 1990, 1992, and 1993. Plaintiff asserted that the IRS had not credited Home for its RAP Right amortization deduction during those years. *Id*. Plaintiff also claimed a loss deduction during for 1993, alleging that Home had abandoned its Missouri Branching Right. *Id*. The IRS denied the refund requests and Plaintiff, on Home's behalf, brought this suit.

In order to establish that Home is entitled to a tax refund, Plaintiff must first establish that Home has a tax basis in the Branching and/or RAP Rights.[4] When this matter first came to district court, the United States argued that Plaintiff's refund claims failed as a matter of law because Home did not have a tax basis in the Rights. As discussed previously in this Order, both parties moved for partial summary judgment on this issue. In its summary judgment motion, Plaintiff raised two alternative theories for establishing a tax basis for the Branching and RAP Rights. First, Plaintiff argued that it can establish a tax basis based on what it cost Home to acquire the Rights (this was Plaintiff's "cost basis theory"). *Id*. at 1215. Under the cost basis theory, Plaintiff asserted that FSLIC effectively sold the Rights to Home in exchange for Home's assumption of the FSLIC's liability with respect to the three failing thrifts. *Id*. at 1217. On this

---

[4]    The term "basis" refers to a taxpayer's capital stake in property. *In re Lilly*, 76 F.3d 568, 572 (4th Cir. 1996). Ordinarily, and where no other exceptions apply, the basis of an asset is equal to its cost, also known as its "cost basis." 26 U.S.C. § 1012.

theory, Plaintiff claimed a tax basis for the Rights since "[t]he assumption of liability in connection with the acquisition of property is part of the property's cost for Federal income tax purposes," and under the Internal Revenue Code, "the basis of property shall be the cost of such property…." *Washington Mut. I*, 2008 WL 8422136 at *3. Plaintiff argued that Home's cost to acquire the Rights was "the amount by which the acquired thrifts' liabilities exceeded the value of their assets." *Id*. Plaintiff therefore concluded that Home took a tax basis in the Rights equal to that excess liability.

In the alternative, Plaintiff argued that it could establish a tax basis for the Rights based on their fair market value (this was Plaintiff's "fair market value theory"). *Id*. Under the fair market value theory, Plaintiff argued that the Branching and RAP Rights were provided by FSLIC to induce Home to enter into the supervisory merger, and as such, are considered income for tax purposes. Dkt. No. 49, Pl.'s Mot. for Summ. J. at 10. According to Plaintiff, "a taxpayer that receives property as income takes a fair-market-value basis in that property." *Id*. Therefore, Plaintiff argued, Home has a fair market value basis in the Branching and RAP Rights. *Id*.

The United States disputed both of Plaintiff's theories for establishing a tax basis. With respect to the cost basis theory, the Government argued that Plaintiff was "double-counting" Home's assumption of the failing thrifts' liabilities. In the Government's view, the primary benefit of the supervisory merger to Home was that the merger was structured as a "tax-free merger commonly referred to as a 'G' reorganization." Dkt. No. 51, Def.'s Mot. for Summ. J. at 2. According to the Government, Home was willing to incur the failing thrifts' liabilities in return for the tax-free merger because the G reorganization allowed Home to realize sizable tax benefits by carrying over the failing thrifts' assets with "built-in tax losses." *Id*. However, the Government argued, 27 years after the transaction occurred, Plaintiff is now attempting to reap a

8

second or "double" recovery for assuming the failed thrifts' liabilities by arguing that Home had assumed the liabilities as consideration for the Branching and RAP Rights. *Id*. at 3.

As for Plaintiff's fair market value theory, the Government argued that neither the Branching Right nor the RAP Right could qualify as income, and as such, Plaintiff cannot claim a fair-market-value basis in the Rights. *Id*.

Judge Coughenour rejected Plaintiff's two alternative theories for establishing a tax basis for the Branching and RAP Rights and granted partial summary judgment in favor of the United States. *Id*. at 1216. With respect to Plaintiff's cost basis theory, the district court: (1) rejected Plaintiff's argument that Home had assumed FSLIC's liabilities, stating that "while [the United States] had an undeniable interest in Home's acquisition of the failing thrifts, it was in no way relieved of its insurance obligations as a result of the transaction. Rather, those obligations were simply less likely to come to fruition,"[5] and (2) determined that Plaintiff had not bargained for the right to assign a separate tax basis to the Branching and/or RAP Rights. *Washington Mut. I*, 2008 WL 8422136 at *6. As to Plaintiff's fair market value theory, the district court held that the Rights did not qualify as income.

Plaintiff appealed the decision to the Ninth Circuit, which reversed and remanded. In reaching its decision, the Ninth Circuit "return[ed] to the very basics of tax law" to note that the term "basis" is a "fundamental concept and refers to a taxpayer's capital stake in an asset for tax purposes." *Id*. at 1217 (citing *In re Lilly*, 73 F.3d 568, 572 (4th Cir. 1996)). The Court further noted that "[g]enerally, a taxpayer's basis in an asset is equal to the cost to the taxpayer of

---

[5]      In making this determination, the district court "agree[d]" that Plaintiff was "double-counting," but not in the terms that the Government had argued (*i.e.* that Plaintiff was attempting to use its assumption of the failed thrifts' liabilities both as consideration for being able to designate the merger as a G reorganization and as consideration for the Rights). *Washington Mut. I,* 2008 WL 8422136, at * 6. Rather, the Court held that Plaintiff was "double-counting" by asserting that Home assumed the liabilities of the failing thrifts *and* the FSLIC's insurance liability. *Id*.

acquiring the asset." *Id*. (citing 26 U.S.C. § 1012). With these principles in mind, the Ninth Circuit turned to the supervisory merger at issue here. It determined that the "documentary evidence, as well as the economic realities of the transaction, compel the conclusion" that the merger "comprised one, all-encompassing transaction" whereby the FSLIC benefited because three failing thrifts were assimilated into one healthy thrift, "thereby considerably reducing the FSLIC's own insurance liability exposure" and Home received "a generous incentive package," which included, among other items, the Branching and RAP Rights. *Id*. at 1218-19. Having determined that the Branching and RAP Rights were part of the consideration Home received in the supervised merger, the Ninth Circuit "appl[ied] basic tax principles regarding basis" and concluded that the cost to Home for acquiring this incentive package "was the excess of the three failing thrifts' liabilities over the value of their assets." *Id*. at 1219. Therefore, the Court concluded, Home's cost basis in the Branching and RAP Rights is "equal to *some part* of the total amount of that excess liability." *Id*. (emphasis in original).[6]

     Accordingly, the Ninth Circuit reversed Judge Coughenour's holding that Plaintiff did not have a cost basis in the Branching and RAP Rights, and remanded with instructions to grant Plaintiff's motion for partial summary motions (*i.e.*, grant Plaintiff's motion that Home has a cost basis in the Rights) and proceed to determining what that cost basis is (*i.e.*, Plaintiff must still establish what the cost basis is for the Branching and RAP Rights). Stated differently, although the Ninth Circuit accepted Plaintiff's argument that, in theory, a taxpayer in Home's position has a cost basis in the Branching and RAP Rights, Plaintiff still had to meet its burden of establishing what that cost basis is.

---

[6]     Because Plaintiff prevailed on its cost basis theory, the Ninth Circuit did not address Plaintiff's alternative, fair market value theory. *Washington Mut. II,* 636 F.3d at 1221 n. 9.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

### III.    DISCUSSION

#### A.    Plaintiff Bears the Burden of Proof

Following the Ninth Circuit's lead, this Court returns to basic tax law principles. It is undisputed that a taxpayer may sue the government in district court to recover taxes erroneously collected or withheld. *Oppel v. United States*, 164 F.3d 631, 632 (9th Cir. 1998) (citing 28 U.S.C. § 1346(a)(1)). "In so doing, the taxpayer must prove that he is entitled to a refund, and must also establish the exact amount of refund owed." *Id*. (citing *United States v. Janis*, 428 U.S. 433, 440 (1975)); *Fed-Mart Corp. v. United States*, 572 F.2d 235, 238 (9th Cir. 1978) ("The taxpayer's burden in a refund suit in district court is to prove not only that the Commissioner erred in his determination of tax liability but also to establish the correct amount of the refund due."); *Moore v. Comm'r*, 425 F.2d 713, 715 (9th Cir. 1970) ("[T]he taxpayer bears the burden of establishing the cost basis of property"); *United States v. Youngquist*, 2013 WL 5268924, at *7 (D. Or. Apr. 17, 2013) (noting that if a taxpayer fails to establish the value of property (where that value is critical to the taxpayer's claim in a refund suit), the taxpayer loses).

It is not sufficient for a taxpayer to "demonstrate that the assessment of the tax for which refund is sought was erroneous in some respects." *Trigon Ins. Co. v. United States*, 234 F. Supp. 2d 581, 586 (E.D. VA. 2002) (quoting *Janis*, 428 U.S. at 440). Rather, in order to prevail, Plaintiff "must establish the exact amount which [it] is entitled to recover." *Compton v. United States*, 334 F.2d 212, 216 (4th Cir. 1964); *Trigon*, 234 F. Supp. 2d at 587 (a plaintiff cannot satisfy its burden "by showing merely that some refund is owed without proving the amount owed"). In the case before the Court, this requires Plaintiff to prove, to a reasonable degree of certainty, Home's cost basis in the Branching and RAP Rights. *See Better Beverages, Inc. v. United States*, 619 F.2d 424, 428 (5th Cir. 1980).

11

The fact that the cost basis may be difficult to establish does not relieve Plaintiff of its burden. *Coloman v. Comm'r*, 540 F.2d 427, 430 (9th Cir. 1976) (citing *O'Neill v. Comm'r*, 271 F.2d 44 (9th Cir. 1959)); *see also Estate of Marsack v. Comm'r*, 288 F.2d 533, 535 (7th Cir. 1961) (noting that whether valuation is difficult or not, it must be established, and complex forms of property must be, and are, valued for tax purposes); *Better Beverages,* 619 F.2d at 428 n.4 ("Where the taxpayer fails to carry [its] burden to prove a cost basis in the item in question, the basis utilized by IRS, which enjoys a presumption of correctness, must be accepted even where, as here, the IRS has accorded the item a zero basis."); *Compton*, 334 F.2d at 216 (same). Lastly, this Court is not required to, and indeed cannot, derive the cost basis from unreliable evidence. *See Norgaard v. Comm'r*, 939 F.2d 874, 879 (9th Cir. 1991) (stating that any estimation of a deduction without that "assurance from the record…would be unguided largesse'")

Plaintiff, relying on *Cohan v. Comm'r*, 39 F.2d 540, 544 (2d Cir. 1930), argues that under *Cohan* and its progeny, a taxpayer claiming a deduction may overcome the presumptive correctness of the IRS' denial, even where the taxpayer has failed to show the exact amount of the deduction, so long as the evidence shows that the taxpayer is entitled to the deduction, and there is sufficient evidence in the record from which the court may estimate the exact amount. Plaintiff is correct that courts have relied on *Cohan* to estimate the amount of a claimed deduction in cases where the taxpayer is unable to produce evidence substantiating the exact amount of a claimed deduction. *Trigon*, 234 F. Supp. 2d at 589. However, courts are reluctant to accept invitations to follow *Cohan* where a taxpayer fails to provide evidence that would permit an <u>informed</u> estimate of the amount of deduction. *Id*. Indeed, the Ninth Circuit has cautioned that a liberal application of the *Cohan* rule "would be in essence to condone the use of that doctrine

12

as a substitute for burden of proof." *Coloman*, 540 F.2d at 431-32. For this reason, courts decline to apply *Cohan* in cases where there is no doubt that the taxpayer incurred some deductible expense, but the taxpayer failed to present evidence sufficient to allow the court to make an accurate finding on the amount of the deduction. *See, e.g., Norgaard*, 939 F.2d at 879 (Ninth Circuit rejected taxpayer's argument that finder of fact was compelled to estimate a value based on the evidence provided); *Coloman*, 540 F.2d at 432. As the *Trigon* court aptly stated:

> [Plaintiff] has cited, and the Court has found, no decision applying the rule of *Cohan* to complex valuation cases such as this one. And, where, as here, the basic evidentiary predicate for valuation has been found wanting in so many ways, to do so would offend fundamental precepts respecting the nature and importance of the burden of proof.

*Trigon*, 234 F. Supp. 2d at 591.

Relying on a case from the Third Circuit, *Capital Blue Cross v. Comm'r*, 431 F.3d 117 (3rd Cir. 2005), Plaintiff also argues that where "the Government refuses to submit expert valuation testimony regarding particular adjustments to a proffered valuation, a court will 'essentially be forced to start from the taxpayer's valuation.'" Pl.'s Post Trial Br. at 15 (quoting *Capital Blue Cross*, 431 F.3d at 130). If the holding in *Capital Blue Cross* were as Plaintiff suggests, it would be inconsistent with the Ninth Circuit's clear precedent that it is the taxpayer's burden to establish the amount of the refund with reasonable precision. However, *Capital Blue Cross* does not stand for the proposition that a court must accept a taxpayer's valuation if a counter valuation is not offered by the Government. Rather, the *Capital Blue Cross* court determined that it had been unreasonable for the Tax Court to reject the plaintiff's valuation simply because the Government "identified minor flaws in [plaintiff's] valuation" and the Government failed to "explain[] or quantify[] how [the flaws] impacted the bottom-line calculation, and [did

13

not] offer[] any alternatives." *Capital Blue Cross*, 431 F.3d at 120, 130. In fact, in its

holding, the *Capital Blue Cross* court adhered to the principle that the taxpayer bears the

"heavy burden" to prove that his intangible asset may be valued with "reasonable

precision," and this burden "will often prove too great to bear." *Id*. at 129-130 (quoting

*Newark Morning Ledger v. United States*, 507 U.S. 546, 566 (1993)).

> ### B.    The Cost Basis for the Branching and RAP Rights is Equal to Some Portion of the Excess of the Failing Thrifts' Liabilities over Their Assets

The Ninth Circuit held that the Branching and RAP Rights have a cost basis that, upon

proper proof, could qualify Home for a tax refund. *Washington Mut. II*, 636 F.3d at 1219. As

discussed above, Plaintiff's burden is to establish, to a reasonable certainty, what that cost basis

is for each Right. The Ninth Circuit provided a road map for answering this question. It

determined that the Branching and RAP Rights were part of the incentive package Home

received from FSLIC, and the cost to Home for acquiring that incentive package was "the excess

of the three failing thrifts' liabilities over the value of their assets." *Id*. Therefore, the Ninth

Circuit concluded, the cost to Home for acquiring the Branching and RAP Rights is "equal to

*some part* of the total amount of that excess liability." *Id*. (emphasis in original). Thus, in order

to determine the cost basis for the Branching and RAP Rights, Home must first establish the

"excess of the three failed thrift's liabilities over the value of their assets" (the parties refer to

this as the "Purchase Price"), and then establish what portion of the Purchase Price was allocated

to the Branching and RAP Rights.

> ### 1.    The Purchase Price

In order to determine how much Home paid for the incentive package it received from

FSLIC as part of the supervisory merger, Plaintiff must establish: (1) the total value of the three

failing thrifts' liabilities, and (2) the total value of their assets. The difference between these two

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

asset values represents the "excess liability" or the "Purchase Price" that Home paid for the incentive package. *Washington Mut. II*, 636 F.3d at 1219. While one may expect that this calculation would be straight-forward (at least relatively speaking), the parties dispute each variable in the calculation.

### 2.    The Allocation of the Purchase Price

In transactions where one lump-sum purchase price is paid for a conglomeration of assets—as is the case here—the cost of each asset must be determined by apportioning the purchase price among the assets according to each asset's relative fair market value at the time of the acquisition. *See, e.g.*, *Bixby v. Comm'r*, 58 T.C. 757, 785 (1972) (holding that "when a taxpayer buys a mixed group of assets for a lump sum, the purchase price will be allocated among the assets in accordance with the relative value that each item bears to the total value of the group of the assets purchased"); *Victor Meat Co. v. Comm'r*, 52 T.C. 929, 931 (1969) (holding that "when a taxpayer buys a mixed aggregate of assets for a lump sum, an allocation of the purchase price will be made to the separate items upon the relative value of each item to the value of the whole"); *C.D. Johnson Lumber Corp.*, 12 T.C. 348, 363 (1949) (same).

Plaintiff asserts that, here, the Purchase Price does not represent the total fair market value of the incentive package Home acquired in the supervisory merger. Pl.'s Post Trial Br. at 54. Indeed, Plaintiff concedes that the total fair market value of the incentive package is *more* than the Purchase Price Home paid for the package. *Id*. In other words, the combined fair market value of each asset in the incentive package is greater than what Home actually paid for the package. This is significant because it means that Plaintiff cannot simply determine the fair market value of one of the assets in the package and then allocate a corresponding percentage of the Purchase Price to that asset. Instead, Plaintiff must establish the fair market value of each

15

asset in the incentive package to arrive at a total fair market value for the package, and from that, determine each asset's pro rata share of the total fair market value. Only when Plaintiff has arrived at a total fair market value for the incentive package can Plaintiff establish the pro rata share of each asset in the total fair market value. The pro rata share allotted to each asset can then be applied to the Purchase Price to establish the cost basis of each asset.

An illustration is helpful. Assume that a thrift paid $300 for an incentive package it received in a supervisory merger. Assume, as well, that the incentive package is comprised of three assets: A, B, and C. Now assume that the fair market value of A is $175, the fair market value of B is $125, and the fair market value of C is $100. Therefore, the total fair market value of the combined assets constituting the incentive package is $400. This information is not sufficient to allow for the correct allocation of the purchase price among A, B, and C. For instance, one cannot simply allot $175 of the purchase price to A because that would result in too much of the purchase price being allotted to A. In other words, A would be allotted one-hundred percent of its fair market value, while B and C would be left with some percentage less than one-hundred percent because only $125 of the purchase price would remain to allocate to B and C, whose fair market value is $125 and $100, respectively, for a total of $225.

Therefore, because the purchase price is less than the total fair market value of A, B, and C, it is necessary to determine each of the asset's pro rata share of the total fair market value. Once this is determined, the pro rata share of each asset can then be applied to the purchase price to determine each asset's pro rate share of the purchase price. In this example, A's pro rata share of the total fair market value is 44%, B's is 31%, and C's is 25%. Therefore, A's pro rata share of the purchase is $132, B's is $93, and C's is $75.

16

However, this formula only works if Plaintiff is able to establish the fair market value for *each* asset in the incentive package. If Plaintiff is not able to establish the fair market value for any one of the assets in the incentive package, it is impossible to ascertain the total fair market value of the incentive package, and thereby, impossible to ascertain the pro rata share of each asset. This is because the total fair market value of the incentive package is the sum of the fair market value of each asset in the package. If any one of these variables is unknown, it is impossible to determine the total fair market value. And, without a total fair market value, it is likewise impossible to determine the pro rata share of purchase price for each individual asset.

In the illustration above, one is able to determine the total fair market value of the incentive package simply by adding together the individual fair market values of the three assets that comprise the package: A's fair market value is $175, B's is $125, and $C's is 100. Therefore, the total fair market value for the incentive package is $400. If, however, the fair market value for A, B, or C is unknown, it is impossible to determine the total fair market of the incentive package (*i.e.*, A($175) + B($125) + C(?) = ?). And, if the total fair market value of A, B and C is unknown, it is impossible to determine each asset's pro rata share of the total fair market value. Likewise, if each asset's pro rata share of the total fair market value is unknown, it is impossible to allocate the $300 purchase price among the assets according to their pro rata share.

In short, in order for this Court to determine what portion of the Purchase Price for the Missouri-Florida Transaction was allocated to each of the Branching Rights (*i.e*, the Missouri Branching Right and the Florida Branching Right) and the RAP Right, Plaintiff must first

17

1

2

establish the fair market value for each asset contained in the incentive package.[7] Failure to

establish the fair market value for any one of the Rights is fatal to Plaintiff's tax refund claims.[8]

3

4

**C.      Plaintiff Failed to Establish the Fair Market Value for the Missouri Branching Right to a Reasonable Degree of Certainty**

5

6

7

8

9

10

11

12

13

14

15

As discussed above, the first step in this process is to determine what Home paid for the

FSLIC incentive package (in other words, what the Purchase Price is). The parties contest this

issue, disagreeing on the extent of the failing thrifts' liabilities, assets, and the values for each.

However, it is not necessary for this Court to resolve this dispute because, for the reasons

discussed below, the Court finds that Plaintiff failed to establish, to a reasonable certainty, the

fair market value for the Missouri Branching Right.[9] Given that Plaintiff failed to establish the

fair market value for the Missouri Branching Right, the Court is unable to ascertain the cost basis

for either the Branching Rights or the RAP Right, or, for that matter, to the incentive package.

Accordingly, Plaintiff has not met its burden of proof, and thus, failed to establish its entitlement

to a tax refund. Plaintiff's claims must be dismissed as a matter of law.

16

17

**1.      The Grabowski Model: An Income Approach to Determining the Fair Market Value of the Missouri Branching Right on the Date of the Missouri-Florida Transaction**

18

19

20

21

Plaintiff's valuation expert, Roger Grabowski, valued the Missouri Branching Right

under the tax law standard for "fair market value." For Federal tax purposes, "fair market value"

is "the price at which the property would change hands between a willing buyer and a willing

22

23

24

25

---

[7]      The parties dispute what assets, exactly, are included in the incentive package for the Missouri-Florida Transaction. For the reasons discussed below, the Court does not reach this issue.

[8]      If Plaintiff were able to establish the Purchase Price and what portion of the Purchase Price was allocated to the Branching and RAP Rights, then the Court must turn to the remaining issues in this litigation, namely whether Plaintiff is entitled to a tax refund based on Home's alleged abandonment of the Missouri Branching Right and whether the RAP Right is amortizable and, if so, over what period of time.

[9]      Plaintiff acquired Branching Rights in both Missouri and Florida through the Missouri-Florida Transaction. However, the parties focus their discussion of the fair market value for the Branching Rights to Missouri. For the sake of simplicity, this Court will do the same.

18

seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." *United States v. Cartwright*, 411 U.S. 546, 551 (1973); *Morrissey v. Comm'r*, 243 F.3d 1145, 1147-48 (9th Cir. 2001) (citing Treas. Reg. § 20.2031-1(b)). Under this standard, the willing buyer and willing seller are hypothetical: "[d]efining fair market value with reference to hypothetical willing-buyers and willing-sellers provides an objective standard by which to measure value." *Propstra v. United States*, 680 F.2d 1248, 1252 (9th Cir. 1982). In addition, value must be determined on the date of the transaction (here, December 17, 1981), and any subsequent event or future value is of no consequence in determining cost basis. *See Moore v. Comm'r*, 425 F.2d 713, 714 (9th Cir. 1970).

Mr. Grabowski used an income approach to determine the fair market value of the Missouri Branching Right to a hypothetical buyer. Day 3 AM 8:16. More specifically, Mr. Grabowski used a discounted cash flow model known as the "excess earnings" approach. Excess earnings represent the cash flows that the hypothetical buyer would have expected the Branching Right to generate beginning in December 1981, net of charges for the use of contributory assets, and discounted to present value. In order to determine the excess earnings (*i.e.* the cash flow) attributable to the Missouri Branching Right under the excess earnings approach, Mr. Grabowski employed a five-step analysis. First, he projected the net operating income generated by the Branching Right based on: (a) the projected rate of overall statewide thrift deposit market growth in Missouri; (b) the projected market share that the hypothetical buyer could be expected to capture in Missouri; (c) the projected spread on loans funded by the new deposits; and (d) the projected operating expenses for the hypothetical buyer. *Id*. at 10: 1-9; 15:21-25. Second, he deducted income taxes from the net operating income to arrive at the projected net income. Third, Mr. Grabowski projected charges for the use of contributory assets (commonly referred to

as "capital charges") and deducted those charges from the net income to arrive at the projected cash flow attributable to the Missouri Branching Right. Fourth, Mr. Grabowski used a 22% discount rate to determine the present value of the projected cash flow. Lastly, Mr. Grabowski deducted estimated transition costs and assemblage value from the present value of the cash flow. This resulted in Mr. Grabowski finding a fair market value of $28.8 million for the Missouri Branching Right.

### a.   First Step: Determine the Projected Net Operating Income Attributable to the Missouri Branching Right

As discussed above, the first step in Mr. Grabowski's analysis was to determine the projected net operating income attributable to the Missouri Branching Right. In order to do this, Mr. Grabowski first had to project the net revenue of the Missouri Branching Right. The Grabowski Model did this by projecting growth in Missouri's new deposit market based on aggregate deposits statistics from 1968 through 1981 for the state of Missouri. Day 3 A.M. at 10:1-9. Based on this information, the Grabowski Model projected that Missouri's new deposit market would increase as follows: 47% in 1982; 39% in 1983; 32.3% in 1984; 26.5% in 1985; and 21.85% in 1986. *See* Ex. 283. Mr. Grabowski attributed the growth increase to inflation and indicated that in real dollar terms, Missouri's deposit market did not actually grow. *Id*. at 15:1-10.

Next, Mr. Grabowski had to calculate the expected share of those new deposits that a hypothetical buyer could expect to capture. *Id*. at 15:13. Here, Mr. Grabowski stated that he assumed that the hypothetical buyer was a "well-capitalized thrift" that would capture part of the Missouri deposit market through offering new products, an image of "safety," and advertising. *Id*. at 15:14-20; 22:18-20. However, because up to this point, thrifts were prohibited from operating branches outside their home market, Mr. Grabowski could not turn to an already-

20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

established interstate thrift operation as a guide to predict how much of the Missouri deposit market the hypothetical buyer could capture. *Id*. at 16:1-7. Instead, Mr. Grabowski used Home's entry into the Northern California market as a model to determine what the hypothetical buyer could expect to achieve. *Id*. at 16:8-25. He felt that this approach was reasonable because Home had originally been limited to opening branches within 100 miles of its headquarters in Southern California, thereby making Northern California a new market in the same way that Missouri would be a new market, and because, according to Mr. Grabowski, the competition in Missouri was similar to the competition in Northern California. *Id*. Thus, the Grabowski Model assumed a hypothetical buyer would capture a market share equal to Home's market share in Northern California after 10 years, which was 7% of the market. *See* Ex. 281. Mr. Grabowski referred to this as "the mid-case market share scenario." [10] *Id*. From this, Mr. Grabowski subtracted the acquired thrifts' existing deposits that were merely acquired through the merger in order to determine the total new deposits available to the hypothetical buyer to reinvest by originating new loan mortgages.

Mr. Grabowski then assumed that all of the new deposits the hypothetical buyer captured would be used to originate new adjustable rate loan mortgages ("ARMS"). "The ARMS, which were the new tool that was granted to thrifts…would allow [the hypothetical buyer] to price differently and price better," putting the hypothetical buyer "first" in line as the lender. *Id*. at 24:1-5. In predicting the hypothetical buyer's ability to make mortgage loans, Mr. Grabowski stated that he assumed that interest rates would remain flat. *Id*. at 25:10-15. However, he did not think this would impact the hypothetical buyer's ability to make loans because the ARMS would

---

[10]     Mr. Grabowski used a scenario analysis, which allowed him to run his model with a variety of assumptions that were probability weighted. Pl.'s Post Trial Br. at 56. Ultimately, Mr. Grabowski adopted the "mid-case scenario" for his final analysis.

be an attractive product to purchasers. *Id*. at 25:18-23. However, he conceded that the flat interest rate would "impact[]" the "deposit market" and "would really tone[] down the amount that was available for new loans." *Id*.

Next, Mr. Grabowski had to project the "spread" the hypothetical buyer would make on the new mortgage loans. The spread is the difference between the interest charged on a mortgage loan and the cost to the thrift for obtaining and maintaining the deposits. *Id*. at 26:5-6. In making this calculation, Mr. Grabowski assumed that the hypothetical buyer would only issue ARMs. *Id*. at 26:11-13. He also assumed that the hypothetical buyer would be getting the deposits in Missouri (which was less expensive than getting the deposits in California) and making ARMs in California, thereby "making a little bit more than the contract spread." *Id*. at 28:15-20; 30:21-24. Based on the cost of funds in San Francisco and Des Moines in 1981, Mr. Grabowski assumed a spread on the loans that ranged between 2.25 and 2.75%. 32:13-25. From this, he assumed the mid-range spread of 2.5% and came up with net revenues of $2,784,000. 38:10-18.

Mr. Grabowski next projected that the operating expenses of a hypothetical buyer would start at 1.8% for 1982, decline to 1.6% in 1983, and continue decline down to 1%. He subtracted the operating expenses from the net revenues to arrive at the projected net operating income. 41:1-6.

### b.   Second Step: Determine the Projected Net Income

In order to determine the projected net income of the Missouri Branching Right, Mr. Grabowski "subtracted the income tax rate that would be applicable to the incremental income that would be earned at the statutory tax rates." 41:8-11. He determined that 36% would be the average tax rate and subtracted that from the operating income to arrive at the projected net income. 41:12-15.

### c.   Third Step: Determine the Cash Flow Attributable to the Missouri Branching Right

In order to isolate the cash flow attributable to the Missouri Branching Right, Mr. Grabowski had to separate out income streams attributable to assets that came from the acquired thrifts. Mr. Grabowski accomplished this by taking capital charges for contributory assets against the projected net income. In this case, Mr. Grabowski determined that the contributory assets included fixed assets (*i.e.*, furniture, fixtures, and equipment), working capital (*e.g.* prepaid expenses, interest income receivables, and other receivables minus operating liabilities), trade name (of the hypothetical buyer), technology, workforce (both assembled and new), and the regulatory minimum capital requirement. Pl.'s Ex. 297. By subtracting capital charges from the projected net income, Mr. Grabowski claimed to calculate the cash flows that are attributable solely to the Missouri Branching Right. *Id.*

### d.   Fourth Step: Determine the Value of the Branching Rights (before Adjustments)

Mr. Grabowski acknowledged that "making projections" is a "risky business," and as such, employed a 22% discount rate to determine the present value of the cash flow attributable to the Missouri Branching Right. 49:2-9. Mr. Grabowski then calculated the residual period cash flow and converted it to its present value. Day 3 A.M. at 53:14-17. Mr. Grabowski concluded that the present value of the cash flow, including the residual value, is $37 million (before adjustments). 53:19-22. He notes that this is actually more conservative than his mid-case scenario. 56:1-2.

### e.   Fifth Step: Determine the Fair Market Value of the Missouri Branching Right

Next, Mr. Grabowski recognized two other "upfront investments" that had to be made by the hypothetical buyer in order to capitalize on the Missouri Branching Right: transaction costs

23

and assemblage value. 56:4-8. Mr. Grabowski determined that the hypothetical buyer would have to invest $1.2 million in transaction costs in order to take over existing and acquire new branches in Missouri (*e.g.*, change signage, advertisement and promotional expenses, and transitioning the workforce). 57:12-21. He also recognized that the hypothetical buyer would have a "head start because [it would be] able to buy the existing branches" of the acquired thrifts (*i.e.*, without this "head start" the hypothetical buyer would need to find branch locations and assemble or build the infrastructure required to get the business operating). 58:3-5. He referred to this as "assemblage value" and set its value at $5 million. 57:19-20. The final step in his analysis was to subtract the transaction cost and assemblage value from the value for the Missouri Branching Right that he had reached in Step Four above. 58:21-24. Based on the foregoing analysis, he concluded that the fair market value for the Missouri Branching Right is $28,800,000. 58:23-24.

**2.     The Government's Challenges to the Grabowski Model: The Model is too Flawed to Form a Reliable Basis for Valuing the Missouri Branching Right**

The Government contends that Mr. Grabowski's discounted cash flow model is simply too flawed to form a reliable basis for valuing the Missouri Branching Right. The Government raises multiple objections to the valuation model; however, its main criticism is that Mr. Grabowski's analysis is based on an unrealistic view of the grim economic circumstances in 1981. The Government charges that there is a "complete disconnect" between the economic reality on December 17, 1981 (*i.e.*, the date of the Missouri-Florida Transaction) and Mr. Grabowski's "rosy projections" with respect to the inputs he used in his Model.

The Grabowski Model, in the Government's view, rests on four "value drivers"—key assumptions that go into predicting the cash flow. Day 5 A.M. 76:17-25. The four value drivers are: (1) growth in the Missouri deposit market, (2) the hypothetical buyer's ability to capture a

24

share of Missouri's deposit market, (3) the hypothetical buyer's ability to originate a high volume of new loans; and (4) the spread between the interest on the new loans and the cost of deposits. 76:22-77:1. The Government charges that the Grabowski Model is overly optimistic with respect to each of these value drivers, which has the net effect of inflating the value of the Missouri Branching Right.[11] The Court addresses each of the Government's challenges to the Grabowski Model below.

### a.    The Grabowski Model's Assumption Regarding the Missouri Deposit Market Growth Is Unreliable

As discussed earlier in this order, the first step in the Grabowski Model's discounted cash flow analysis is to determine the projected net operating income for the Missouri Branching Right. To do this, Mr. Grabowski projected the Missouri deposit market growth rate and calculated the hypothetical buyer's expected share of that market. As discussed above, the Grabowski Model anticipated that the Missouri deposit market would grow as follows: 47% in 1982; 39% in 1983; 32.3% in 1984; 26.5% in 1985; and 21.85% in 1986. *See* Ex. 283, row 3. In addition, the Grabowski Model projected that the hypothetical buyer would eventually capture 7% of the Missouri deposit market, based on Home's expansion in the Northern California market.

The Government argues that these are unrealistic projections in light of the grim economic circumstances surrounding the thrift industry in 1981. As a preliminary matter, the Government points out that deposits were swiftly flowing out of the thrift industry in 1981. According to the Government, this outflow, known as disintermediation, was a function of the

---

[11]    The Government also contends that the Grabowski Model inflates the value of the Florida Branching Right, for the same reasons it overvalues the Missouri Branching Right. However, because this Court finds that the Grabowski Model is unreliable as to the Missouri Branching Right, it is unnecessary for this Court to also address the Government's arguments concerning the Florida Branching Right.

juxtaposition of high interest rates and restrictive regulations. The Government's expert, Dr. Steven Mann, testified that historically regulators placed ceilings on the rates of interest that thrifts could pay depositors. Day 5 A.M. 56:3-57. According to Dr. Mann, in the early 1970's, the interest rate ceilings had the positive effect of keeping costs down for the thrift industry and allowed thrifts to earn generous positive net interest margins on loans. However, with the onset of high inflation, depositors demanded higher returns to keep pace with the eroding value of their money. *Id*. As competing products not subject to the interest rate ceilings imposed on the thrifts began to enter the market, deposits began to flow out of thrifts and into these newer products.[12] The Government argues that the effects of disintermediation are reflected in industry statistics that show a sharp downward trend in levels of new net deposits received by FSLIC-insured thrifts from 1976 through 1981. *See* Ex. 605. Indeed, the Government points out, Home lost approximately $720 million in deposits in 1981. *See* Ex. 17, p. KS-009372.

The Government argues that the fundamental reality of disintermediation did not change for the thrift industry until Congress, with the passage of the Garn-St. Germain Act in late 1982, authorized thrifts to offer a product that could directly compete with other deposit products. Indeed, in the *final two weeks* of December 1982, after Home began offering the new "Money Market Deposit Account" authorized by the Act, Home attracted over $1.2 billion in new deposits. *See* Ex. 18, p. KS-009476.

The Court is persuaded by the Government's argument. As the Government points out, the Grabowski Model does not address disintermediation. Instead, the Model projects a high rate

---

[12] Eventually Congress began to loosen restrictions on deposit products within the thrift industry. In 1980, Congress passed the Depository Institutions Deregulation and Monetary Control Act of 1980, but under this Act, the restrictions were to be phased out over a period of five to six years. Day 5 A.M. 56:3-57:25. Therefore, as of the date of the transaction (December 17, 1981), thrifts still operated at a competitive disadvantage to other competing deposit products.

26

of deposit growth in Missouri, ranging between 21% and 47% between 1981 through 1986, until it is eventually reduced over time. Although Mr. Grabowski claimed at trial that the introduction of the "All Savers Certificate" justified his robust deposit projections, in reality the product was quickly labeled a "dud." Day 3 A.M. 13:23-14:12; Day 6 P.M. 26:23-29:24. Nor is this Court persuaded by Plaintiff's contention that the Grabowski Model actually shows nominal deposit growth if it is adjusted for inflation. As will be discussed later in this section, Plaintiff's contention is only true for the Model's statewide deposit projections. Once those projections are multiplied by the hypothetical buyer's share of the deposit market as projected by the Model, the Model more than compensates for inflation. *See* Ex. 283. Plaintiff's contention that the hypothetical buyer would be able to lure deposits from other existing thrifts on account of its perceived "safety" is also unpersuasive. The Court finds it a much more likely scenario that if a depositor was indeed willing to move funds, the funds would have been moved to a bank with an equivalent "safe" reputation, but one that offered a deposit product with a higher rate of return (*i.e.*, a product that the hypothetical buyer—a thrift—could not offer until late 1982 after Congress passed the Garn-St. Germain Act).

What is more, the Grabowski Model projects Missouri's deposit growth by relying on the State's aggregate deposit statistics. *See* Ex. 277. However, as Mr. Grabowski conceded during his trial testimony, the deposit statistics included "interest credited" balances (*i.e.*, interest posted to accounts of existing customers that is not a source of "new" deposit funds that can be loaned out). Day 3 P.M. 27:8-30:16. Thus, the statistics artificially skewed the numbers towards a higher rate of new deposit growth.[13]

---

[13]     Plaintiff argues that the "interest credited" issue is a non-starter because as long as the depositor does not "withdraw the credited interest amounts from her account, the thrifts would have that new cash available to make loans." Pl.'s Post Trial Br. at 63-64. The Court disagrees. While interest credited, if not withdrawn, may be available for loans, it still is not "new" deposit growth.

### b.   The Grabowski Model's Assumption that the Hypothetical Buyer Will Capture 7% of the Missouri Deposit Market Is Unrealistic

The Government also contends that the Grabowski Model's assumption that the hypothetical buyer will achieve a 7% share of Missouri's deposit market is unreliable. As discussed previously, Mr. Grabowski reached this assumption based on his analysis of Home's expansion into the Northern California market. But, as the Government points, Home's expansion into Northern California largely predated disintermediation, and thereby, escaped its adverse effects. This Court agrees that Home's expansion into Northern California is not a reliable indicator of the hypothetical buyer's ability to capture a share of the Missouri deposit market. Home's expansion into the Northern California market took place in the 1970's. During the 70's, the thrift industry was in an entirely different economic landscape than existed at the time of the Missouri-Florida Transaction; indeed, unlike the 70's, in 1981, the entire industry was economically insolvent to the tune of billions of dollars. *See* Ex. 769 (Richard T. Pratt, the chairman of the FHLBB in 1981 stating "In 1982, the Bank Board saw no [surviving thrifts] in the event that the then present financial conditions continued or worsened."). Based on this alone, Home's experience in Northern California is a wholly unreliable indicator of the hypothetical buyer's ability to capture a share of the Missouri deposit market.

That Home's expansion into Northern California is an unreliable indicator is further substantiated by the fact that Home paid for a significant portion of its growth into Northern California by acquiring existing thrift institutions. Day 5 P.M. 8:15-23. The Grabowski Model, in contrast, bases the hypothetical buyer's ability to capture market share solely on organic expansion (*i.e.*, the hypothetical buyer would open new branches as opposed to acquiring branches that already were up and running). *See* Pl.'s Post Trial Br. at 60. Plaintiff attempted to

overcome this fundamental difference between Home's Northern California expansion and the Grabowski Model by claiming that "Mr. Grabowski concluded that a buyer could have achieved the same market share after ten years by opening branches or buying branches, and simply used the ten-year market share as a benchmark." *Id*. (citing Day 7 A.M. 21:22-22:1). In other words, in Mr. Grabowski's view, whether the buyer captured its market share by opening new branches or by acquired existing branches, the buyer would have had the same market share at the ten year mark. Plaintiff further claims that the Model properly reflected the cost of opening new branches in capital charges, and through the S-curve that reflected smooth growth rather than erratic growth through acquisitions. *Id*.  To the contrary, the Court finds that the Grabowski Model did not properly account for the expense of such rapid growth. *See* Day 6 A.M. 32:13-39:24  (Dr. Mann noting that the Model does not account for any such growth); 34:19-25 ("Well, there must – for the model to make any sense or have any reliability, there must be some payment for all of this growth" but "I couldn't really find anything.").

In addition, the Grabowski Model stands in marked contrast to contemporaneous business projections prepared by Home for the Securities and Exchange Commission ("SEC") three days before the Missouri-Florida Transaction closed. *See* Ex. 132. In a December 14, 1981 letter from M.J. Antoci, who at the time was Home's chief financial officer, to the SEC, Mr. Antoci projected a "most probable case" scenario that Home would be able to acquire $638 million in new Missouri deposit funds by the end of 1986—compared to the over $1 billion in new funds that the Grabowski Model projects the hypothetical buyer will have by the end of 1986. *Id*. at KS-050398. This contrast is made more remarkable because Mr. Antoci assumed falling interest rates in his analysis, whereas the Grabowski Model assumes that interest rates will remain flat. Day 1 P.M. 25:4-17. Lowering the Grabowski Model's market share rate in Missouri to a level

that aligns with Mr. Antoci's projections for 1986 reduces the Model's computation of the Missouri Branching Right fair market value by almost fifty percent. Day 5 P.M. 10:14-25.

      c.      **The Grabowski Model's Assumption that the Hypothetical Buyer Will Originate a High Volume of New Loans Is Unrealistic In Light of the Evidence Presented at Trial**

      As discussed previously in this order, the Grabowski Model assumes that all new Missouri deposits captured by the hypothetical buyer would be used to originate new adjustable rate mortgages ("ARMs"), particularly in California where, Mr. Grabowski testified, demand for loans remained high. *Id*. at 25:18-23. This is an important assumption because a high influx of new deposits without an ability to generate new loans would significantly impact a thrift's earnings. This is because the thrift would have to carry the cost of the interest on the deposits, without receiving mortgage payments to offset those costs. The Government argues that this assumption is fundamentally flawed because the evidence presented at trial shows that during 1981, the thrift industry was unable to originate mortgage loans at any appreciable volume. Indeed, the Government points to Home's own statistics which reveal that Home originated a mere $342.6 million in new mortgages in 1981, compared to the $2.3 billion in new mortgages it originated in 1976. *See* Ex. 17, at pp. KS-009443, KS-009439. This precipitous drop in loan volume was the direct result of the "sky-high" interest rates and the inability of home buyers to finance their purchases. As Mr. Antoci testified, "Nobody could afford the rate." Day 1 P.M. 20:6-12. Nevertheless, as the Government points out, despite this stark reality, the Grabowski Model assumes that the hypothetical buyer would be able to originate loans at an "astonishing[ly] high rate."

      Plaintiff responds that it was reasonable for the Grabowski Model to make this assumption because Home and other thrifts "historically had been able to use all of their deposits

to make mortgages." Pl.'s Post Trial Br. at 62 (citing Day 3 A.M. 24:17-19). The Court finds this argument unpersuasive for at least two reasons. First, as previously discussed, relying on Home's prior ability to originate loans ignores that fact that interest rates had sky-rocketed at the time of the Missouri-Florida Transaction. Home's prior ability to originate loans is simply not a reliable indicator in the grim economic realities of 1981. Second, as Mr. Antoci testified, the thrift industry was a loan driven industry, which meant that if loan demand was high, a thrift sought to attract new deposits. If the loan demand was weak, a high influx of deposits would drag down earnings. Day 1 P.M. 40:10-13. Given this model, it is not surprising that Home managed to originate loans from all of its deposits in the past—this simply meant that Home was good at judging its need for deposits. The Grabowski Model, on the other hand, is deposit-driven, meaning that the hypothetical buyer was expected to capture as many new deposits as possible and *then* attempt to originate mortgages from those funds. Under the Grabowski Model, the hypothetical buyer could well generate more deposits funds than it could turn into loans.

Plaintiff also contends that it is a reasonable assumption that the hypothetical buyer would able to use all new deposits to originate mortgages because the hypothetical buyer would be offering ARMs. Plaintiff argues that ARMs were "most attractive in a high interest rate environment because they could be priced at one or two percent below the fixed rate mortgages being offered by other lenders. Pl.'s Post Trial Br. at 62. According to Grabowski, "ARMS, which were the new tool that was granted to thrifts…would allow [the hypothetical buyer] to price differently and price better," putting the hypothetical buyer "first" in line as the lender, thereby allowing it to originate a significant volume of loans. *Id*. at 24:1-5.

Plaintiff's argument cannot be reconciled with the evidence presented at trial. Mr. Antoci testified that it was inconsistent to project high loan volume during 1981's sky-rocketing interest

rates. Day 1 P.M. 25:4-11 (stating that Home could not assume high loan volume while the interest rates remained high. "In fact, we couldn't have assumed even survival if [the interest rates] stayed at the level at the end of 1981."). What is more, even when Home first offered ARMs in California in November of 1981, Home's loan origination volume continued to stagnate because "potential buyers [were] unable to qualify for [the] loans." 20:6-12; Ex. 17 p. KS-009392. Indeed, as of December 1981, Home's management was unsure of whether Home's ARMs "would be accepted in volume" by its residential loan customers. Ex. 17 p. KS-009369. Mr. Antoci testified that "interest rates were too high to make that determination because very few loans were being made." Day 1 P.M. 33:15-21; 25:4-13 (testifying that Home had no expectation of making a large volume of ARMs, unless interest rates fell).[14]

In light of the evidence presented at trial, the Court finds wholly unreliable the Grabowski Model's assumption that a hypothetical buyer would be able to originate a volume of new loans sufficient to absorb the amount of new deposits that the Model assumes the buyer would capture.

> **d.     The Grabowski Model's Assumption that the Hypothetical Buyer Will Make a Net Interest Spread of 2.5% Is Unrealistic In Light of the Evidence Presented at Trial**

The Grabowski Model assumes a hypothetical buyer (in the mid-case scenario) can make ARMs at a spread over deposits costs of 2.5%. *See* Ex. 302, row 2. The Government presumes that Mr. Grabowski based this assumption on Mr. Antoci's testimony that Home expected to

---

[14]     The Government's expert, Dr. Mann, repeatedly faulted the Grabowski Model because it was based on the assumption that interest rates would drop. The Court does not agree with Dr. Mann on this point. The Grabowski Model was based on an underlying assumption that interest rates would remain flat far into the future. *See* Day 3 A.M. 5:2-17.

price ARMs to yield 2.25% or 2.5% more than the Eleventh District Cost of Funds Index.[15] The Government argues that this is a faulty assumption because the Eleventh District Cost of Funds Index measured the average costs on all existing deposits, not just the new, higher-rate deposit products. For instance, from December 1981 to January 1982, the average cost of funds, as measured in the Eleventh District, was in the range of 11.95-12.18%. *See* Ex. 613. In contrast, the Government points out, the going rate for a new market rate six-month CD during that same timeframe was 13.07-14.25%. *Id*. According to the Government, since the Grabowski Model is based on new loans with *new* deposits, the hypothetical buyer would have to pay the going rate for a *new* market rate CD—in other words .75% to 1% more than the *average* cost reflected in the Eleventh District Index, thereby narrowing the achievable net interest spread from 2.5% as the Grabowski Model projects to a more modest 1.5 to 1.75%. Day 5 P.M. 18:24-24:6. Reducing the net interest spread to this more modest margin reduces the Model's computation for the Missouri Branching Right's fair market value by almost 60%. *Id*. at 22:11-24:6.

Plaintiff counters that the Government's assumption that the hypothetical buyer would have to pay competitive interest rates in order to attract new deposits is incorrect. In Plaintiff's view, the hypothetical buyer would have been able to attract new deposits simply by using "marketing and [its] secure reputation[]…, just as Home did in Northern California in the 1970s." Pl.'s Post Trial Br. at 65. However, as this Court has already determined, relying on Home's experience in Northern California in the 1970's is not a reliable indicator of what the hypothetical buyer would have been able to accomplish in the 1980's.

---

[15]    The Eleventh District Cost of Funds Index is one of many indices used by mortgage lenders to adjust the interest rate on adjustable rate mortgages. It is computed from the actual interest expenses reported for a given month by Arizona, California, and Nevada savings institution members of the Federal Home Loan Bank of San Francisco that satisfy the bank's criteria for inclusion in the Index. See http://www.fhlbsf.com/resource-center/cofi/ (last accessed February 10, 2014).

33

1

        e.      **Assemblage**

2       Turning away from the four value drivers in the Grabowski Model, the Government next

3   challenges the Model's attempt to isolate a license value for the Missouri Branching Right by

4   comparing a "without" or start-up scenario to a baseline "with" scenario. Day 5 P.M. 38:8-10.

5   The parties agree that the Branching Right was a license—the hypothetical buyer was granted a

6   license to operate in Missouri. The Grabowski Model tries to isolate value of the license by

7   comparing a "without" scenario to a baseline or "with" scenario. In other words, in the "without"

8   scenario, the Model assumes that the hypothetical buyer enters the Missouri market without any

9   existing network to work with (*i.e.*, no branches, work force, teller machines, *etc.*, what the

10  parties refer to as "assemblage"). In the "with" scenario, the hypothetical buyer enters the market

11  with "a running start" (*i.e.*, existing branches that are already up and running).  By calculating

12  what the hypothetical buyer would have do in order to reach the same point in the "without"

13  scenario, as where the hypothetical buyer would be in the "with" scenario, the Model projects the

14  value of the license. The Model's mid-case scenario projected that the "without" scenario would

15  catch up to the "with" scenario within four years. 30:6-10. To do this, however, the Model

16  projected that the hypothetical buyer would achieve new deposit growth in the "without"

17  scenario of between 90% to 165% over those four year period. 41:9-14. The Government argues

18  that this growth rate for the "without" scenario "simply def[ies] explanation." This Court agrees.

19  Assuming such extravagant growth during a time when depositors were fleeing the savings and

20  loan market defies credibility.

21      What is more, the Grabowski Model does not take into account the possibility that the

22  licensing value might decline over time. Mr. Antoci testified that at the time of the Missouri-

23  Florida Transaction, several other thrifts had acquired interstate branching rights. As such, the

24

25

34

Model should have addressed the possibility that more thrifts would be given the right to enter the Missouri market, thereby diluting the value of the Missouri Branching Right. Day 5 P.M. 46:8-19. However, instead of accounting for this possibility, the Model projects that the licensing value will increase into perpetuity.

### D.    Dr. Mann's Market Analysis

The Government challenged the reliability of the Grabowski Model, not only by challenging the inputs and assumptions that Mr. Grabowski made in completing his analysis, but also by performing a market analysis on approximately two hundred in-state thrift mergers that occurred near the date of the Missouri-Florida Transaction. Day 5 P.M. 71:14-15. The Government points out that Plaintiff attributes Home's willingness to pay a premium to acquire the failing thrifts (*i.e.*, Home was willing to pay a purchase price above and beyond the failing thrifts' assets) because Home wanted the Branching Rights. In the Government's view, if Plaintiff's assumption is correct, then a similar premium should not be found in the in-state mergers because these transactions necessarily did not include branching rights.75:6-12. However, Dr. Mann's market analysis of the in-state mergers revealed that the acquiring thrifts in these transactions still paid a premium similar to that of the Missouri-Florida Transaction. *Id*. Based on this, Dr. Mann concluded, the purchase premium must be for some other intangible asset. *Id*. Thus, in the Government's view, the Grabowski Model errs by attributing a significant percentage of the premium in the Missouri-Florida Transaction to the Missouri Branching Right.

Plaintiff counters that Dr. Mann's market analysis is "worthless" because it compares in-state mergers that did not involve FLSIC assistance with the Missouri-Florida Transaction that did involve FLSIC assistance. Pl.'s Post Trial Br. at 77. As Plaintiff points out, the FLSIC used interstate branching rights only in mergers involving the least desirable thrifts. Day 2 A.M. 70:2-

35

14. "Thus, the very fact that the [Missouri-Florida] Transaction involved the acquisition of failed thrifts in a FLSIC-assisted interstate supervisory merger involving Branching Rights reveals that [the failed thrifts] were qualitatively different than the thrifts involved in the unassisted in-state mergers Dr. Mann examined." Pl.'s Post Trial Br. at 78. Therefore, Plaintiff argues, it is "clear that Dr. Mann's in-state mergers were generally not comparable to the [Missouri-Florida] Transaction and cannot be used in a market analysis to determine the fair market value of the Branching Rights." *Id*. at 78-79.

Nevertheless, Mr. Grabowski examined 55 in-state mergers in Dr. Mann's market analysis to determine "why the acquiring thrifts in those cases might have been willing to pay a [premium]." *Id*. at 79. Mr. Grabowski concluded that the acquirer in those mergers benefited "from marketing and operational efficiencies" (what he referred to as "synergy"), as well as "some trade name value and market positioning." *Id*.  In order to determine the potential value of this "synergy" in the in-state mergers, Mr. Grabowski analyzed the median transaction from Dr. Mann's market analysis—the Penn Federal Savings acquisition of Sayreville, both of which were thrifts in New Jersey. Day 7 P.M. 28:23-29:8. He discovered that Penn Federal Savings was a "medium" thrift (based on data from the 1982 Functional Cost Analysis ("FCA") and Sayreville was a small thrift. After the merger, the combined assets of the two thrifts placed them in the FCA "large" thrift category, which Mr. Grabowski concluded would likely achieve synergies as a result of the reduced operating expenses. 36:3-20. Based on the average operating costs of thrifts in the FCA's various sized grouping (*i.e.* small, medium, and large), Mr. Grabowski concluded that 80% of the $10 million premium associated with the Penn-Sayreville merger was attributable to synergy value. 37:5-38:4. This, he concluded, was on par with the fair market value the Grabowski Model attributed to the Missouri Branching Right.

36

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

The Government contends that Mr. Grabowski's concluding premise—that the premium paid in the in-state transactions can be explained by "synergy"—is incorrect because Dr. Mann's analysis reveals that similar premiums were paid by both large and small in-state acquiring thrifts. 31:19-33:8 (Dr. Mann testifying that "synergies" cannot explain the premiums paid because the larger thrifts would not gain as much synergy value from acquiring smaller thrifts). Because large thrifts would not benefit from a significant "synergy" boost by entering into these transactions, "synergy" cannot explain why the large thrifts were still willing to pay a premium on par with the premium in the Missouri-Florida Transaction.[16]

The Court finds that Plaintiff has not adequately explained why the premium paid by acquiring thrifts for both in-state mergers (without branching rights) and interstate mergers (with branching rights) were of similar proportion. Mr. Grabowski's contention that in-state thrifts were willing to pay such a high premium to acquire "synergies" is contradicted by Dr. Mann's testimony that large thrifts (who would not benefit to a great extent from synergy) paid similar premiums. Accordingly, the Court finds that Dr. Mann's market analysis significantly undercuts the trustworthiness of the Grabowski Model.

### D.   Plaintiff Did Not Abandon the Missouri Branching Right

In order to succeed on its tax refund claim for the Missouri Branching Right, not only does Plaintiff have the burden of establishing the cost basis for the Right, but Plaintiff must also establish that Home abandoned the Right. Section 165 of the Internal Revenue Code allows a taxpayer to deduct "any loss sustained during the taxable year," so long as the loss is not

---

[16]       The Government also argues that Mr. Grabowski artificially inflated the operating costs of the in-state thrifts in order to find greater synergy in the in-state mergers by looking to the operating costs of thrifts that had 40% of their assets in auto installment loans. Day 8 A.M. 28:17-23. Auto loans, by nature, are more expensive to service than mortgages. Therefore, the Government argues, looking to these thrifts artificially inflated the operating costs for the in-state thrifts. 30:10-12.

37

compensated by insurance or otherwise. 26 U.S.C. § 165(a). "An abandonment loss is deductible if evidenced by a closed and completed transaction that is fixed by an identifiable event occurring in the year of the claimed loss, but only if the taxpayer shows both an intention to abandon the asset in question and an affirmative act of abandonment." *Lapin v. Comm'r*, 956 F.2d 1167 (9th Cir. March 12, 1992) (citing *A.J. Indus., Inc. v. United States*, 503 F.2d 660, 670-71 (9th Cir. 1974)). Thus, Plaintiff must show through the surrounding facts and circumstances (1) that Home intended to abandon the Missouri Branching Right and (2) that Home performed an overt act of abandonment. Neither the non-use of an asset nor the mere intention to abandon is sufficient by itself to accomplish abandonment. *A.J. Indus.*, 503 F.2d at 670 (quoting *Beus v. Comm'r*, 261 F.2d 176, 180 (9th Cir. 1958)).

The parties presented the following evidence at trial. Sometime in the early 1990s, Home made a business decision to close deposit-taking branches in certain states because those branches were not operating efficiently.  Rinehart's Dep. 8:22-14:11. Missouri branches were especially inefficient, and Home decided to sell them.  *Id.* at 14:12-17. The decision to close branches in certain states was made by Home's executives, including CEO Rinehart. However, Home entrusted upper-level managers, more particularly, Senior Vice President Verne Kline, with the task of implementing the geographic strategy of selling inefficient deposit-taking branches.  Kline's Dep. at 22:16-23:18.

In 1992 and 1993, Verne Kline negotiated and signed three agreements to sell or exchange Home's Missouri branches.  *See generally id.*; Def.'s Exs. 420-22. These agreements each contained a covenant not-to-compete, which prohibited Home from soliciting deposits for a set time period (either two or three years depending on the agreement) in a designated non-compete area.  *Id.* However, depending on the covenant, Home retained certain flexibilities.

38

For instance, the May 28, 1993 agreement stated that Home could not "establish, open, operate, purchase, or acquire a deposit-taking office of branch of a thrift institution or commercial bank within the Springfield, Missouri Metropolitan Statistical Area," *i.e.* the Non-Compete Area. Def.'s Ex. 422 at 19-20. Yet the covenant carved out exceptions: it explicitly allowed Home to purchase, acquire and operate a branch within the Non-Compete Area in the event that Home merged or purchased a thrift institution that already operated thrifts in the Non-Compete Area, or in the event that another thrift institution that operated thrifts in the Non-Compete Area purchased Home. *Id.*

The May 21, 1993 agreement forbade Home from opening any offices for deposit gathering activities or otherwise soliciting deposits in the State of Missouri, but the agreement allowed Home to maintain any branches already in existence. Def.'s Ex. 421 at 19-20. Similarly, the July 31, 1992 agreement contained a covenant not-to-compete that allowed Home to continue its operations of existing branches, and it also allowed Home to open new loan offices (as opposed to deposit-taking branches) in the designated non-compete area. Def.'s Ex. 420 at 29.

Plaintiff argues that this evidence demonstrates that Home both had the intent to abandon the Missouri Branching Right in 1993 and acted affirmatively to do so. According to Plaintiff, Home abandoned the Missouri Branching Right by closing its Missouri deposit-taking branches. Def.'s Post Trial Br. at 99. Plaintiff states that Home notified the Office of Thrift Supervision of its intention to permanently leave the Missouri market and discussed its decision with stock analysts and shareholders. *Id.* at 101 & 107. Plaintiff concludes that "Home [] abandon[ed] the [Missouri Branching] Right by abandoning the economically inefficient business in which it used the Right (*i.e.*, Missouri deposit taking), disposing of the assets it used in that business (*i.e.*, the Missouri branches), and ceasing to use the Right in that business." *Id.* at 104. Thus, Plaintiff

argues, it is entitled to a deduction for Home's cost basis in the Right for the 1993 tax year.[17] *Id.* at 96-97.

The Government counters that Plaintiff failed to show that Home "affirmatively gave up its legal right to operate branches in Missouri in 1993." Def.'s Post Trial. Br. at 89. According to the Government, Home did not achieve abandonment of the Missouri Branching Right simply by disposing of the Missouri branches because the branches and the Branching Right constitute two separate assets. *Id.* at 89. Instead, the Government maintains, "all available evidence leads to the conclusion that Home retained its Missouri [B]ranching [R]ight after 1993 in the event that it subsequently decided to return to Missouri at some point in the future." *Id.* at 91. More specifically, the Government observes that as part of Home's sale of its Missouri deposit-taking branches Home signed covenants not-to-compete, which restricted Home from reestablishing deposit-taking branches in Missouri for two to three years but did not preclude Home from opening Missouri branches after that time.  *Id.* The Government argues that the testimony of Verne Kline, Home's employee who negotiated the sale contracts of the Missouri branches, further supports that Home intended to leave open the ability to reenter the Missouri market in case a favorable opportunity should present itself. *Id.* at 93. Moreover, the Government asserts, Home did not publically or privately express any intention to abandon its Missouri Branching Right in 1993, instead waiting until 1996 to make a public proclamation that it had abandoned the Right. *Id.* at 98. Lastly, the Government argues that Home had no incentive to abandon the Right, as there was no cost associated with retaining the Right while it might have presented some future value. *Id.* at 100.

---

[17]     This argument assumes, of course, that Plaintiff had been able to establish Home's cost basis in the Missouri Branching Right.

The Court finds that Plaintiff failed to establish that Home intended to abandon the Missouri Branching Right. Each of the three agreements to transfer Home's Missouri branches contained covenants not-to-compete that contemplated that Home may not only re-enter the Missouri market after a designated time period, but may also continue to operate branches that were already in existence. In the Court's view, these terms counter Plaintiff's assertion that the covenants not-to-compete were just routinely included in these types of transfer agreements. The terms of the covenants not-to-compete undermine Plaintiff's position that Home's sale and transfer of the Missouri branches constitutes an affirmative act indicating abandonment.

Mr. Kline's testimony further brings into doubt Home's intention to permanently abandon its ability to purchase and operate branches in Missouri. According to Mr. Kline, the covenant not-to-compete clauses were meant to provide Home with flexibility "should an opportunity arise or if there [was]a change of a decision." Kline Dep. at 83:14-16. In negotiating the sale and transfer of Home's Missouri branches, Kline understood he should aim to retain "the most flexibility that [Home] could get." *Id.* at 85:4-6. Kline explained that Home did not want the non-compete clauses to present obstacles "if [Home] were to go out and acquire another national firm that perhaps had branches in these [non-compete] areas." *Id.* at 85:8-12. Further, both Messrs. Kline and Rinehart explained that, other than the covenants not-to-compete, there was nothing prohibiting Home from opening branches in Missouri. Kline's Dep. at 99: 11-18. Such testimony cuts against Plaintiff's argument that Home's closure of the Missouri branches demonstrates either the intent to abandon or an overt act of abandonment.

Moreover, this Court is not persuaded that Home performed an affirmative act in furtherance of its abandonment of the Missouri Branching Right when it notified stock analysts, shareholders, and the Office of Thrift Supervision that it was closing its Missouri branches. The

41

1  Court finds that Home indeed made such notifications and that the notifications signaled that

2  Home intended to close its Missouri branches. However, these notifications did not demonstrate

3  that Home was permanently surrendering its right to purchase and operate a deposit-taking thrift

4  branch in Missouri—the asset at issue here.

5      Instead, the evidence (*i.e.* the covenants not-to-compete and Mr. Kline's deposition)

6  supports that while Home may have closed its Missouri branches and did not plan to purchase

7  additional branches, Home recognized the value in leaving the Missouri Branching Right intact.

8  The ability to re-enter the Missouri deposit-taking market in the future may have benefitted

9  Home in ways other than the purchasing and operating of branches. For instance, Home may

10 have been more attractive to buyers or to other thrifts seeking to merge. Indeed, retaining the

11 Missouri Branching Right for such a purpose would have made sense in light of Mr. Rinehart's

12 testimony that "at the time we were seeing a lot of consolidation in the industry, so competitors

13 were getting larger, more concentrated in their ability to compete." Mr. Rinehart's Dept. 10:16-

14 19. For these reasons, the Court rejects Plaintiff's argument that Home "end[ed] the usefulness of

15 the [Missouri] Branching Right," once it "disposed of the [Missouri] branches." Def.'s Post Tr.

16 Br. at 103.

17      The Court also disagrees with Plaintiff's argument that Home abandoned "the business"

18 in which the Missouri Branching Right was used when it decided to exit the Missouri market.

19 Plaintiff conveniently defines Home's business narrowly, as the "branch banking business in

20 Missouri," whereas the Court finds that Home's business was the savings and loans business

21 throughout the United States. By defining Home's business more broadly, it becomes clear that

22 Home's exit of the Missouri market did not necessarily result in "ending the usefulness of the

42

[Missouri] Branching Right," since, as described above, the Missouri Branching Right may have played a role in Home's future growth and/or interest.

In sum, the Court finds that Home took actions to safeguard, rather than permanently disavow, its Missouri Branching Right. Such actions made sense considering that the Missouri Branching Right retained value for Home. Accordingly, the Court concludes that Home did not abandon its Missouri Branching Right so as to qualify for a deduction pursuant to 26 U.S.C. § 165(a).

## IV.   CONCLUSION

After hearing testimony at a trial before this Court, reviewing the exhibits, testimony, and pleadings submitted by the parties, and considering all of the evidence presented, the Court rules as follows:

1.    Plaintiff failed to carry its burden in that it has not established a reliable cost basis for the Missouri Branching Right. Without such a basis, Plaintiff is unable to support its right to a tax refund for the 1990, 1991, and 1993 tax years; and

2.    Plaintiff has failed to persuade the Court that Home permanently abandoned its right to operate branches in Missouri. Thus, Plaintiff is not entitled to a refund for abandonment loss for the 1993 tax year.

For these reasons, Plaintiff's tax refund claims are HEREBY DISMISSED.

Dated this 10th day of February, 2014.

Barbara Jacobs Rothstein
U.S. District Court Judge

43

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25